United States District Court
Middle District of Florida
Jacksonville Division

**MARYANN ROBERTS GUNDERSON,**

    *Plaintiff,*

v.                                              No. 3:15-cv-940-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

---

### Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of the Social Security Administration ("SSA") denying Maryann Roberts Gundersen's[1] claim for disability-insurance benefits.[2] She seeks reversal, Doc. 23; the Commissioner, affirmance, Doc. 24. This order adopts the summaries of

---

[1]The case caption spells the plaintiff's last name as "Gunderson," and her counsel uses that spelling. *See generally* Doc. 23. But documents in the transcript of the administrative proceedings (including at least one the plaintiff apparently completed herself) indicate her last name is "Gundersen." *See, e.g.*, Tr. 9, 30, 228, 293.

[2]The SSA uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of her denial. *Bowen v. City of New York,* 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If the claimant is dissatisfied with the initial determination, she may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If she is dissatisfied with the reconsideration determination, she may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943. If she is dissatisfied with the ALJ's decision, she may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, she may file an action in federal district court. 20 C.F.R. § 404.981. Section 405(g) provides the basis for the court's jurisdiction.

facts in the Administrative Law Judge's ("ALJ's") decision and parties' briefs. *See* Tr. 13–22; Doc. 23 at 1–11; Doc. 24 at 1–3, 6–11, 16–17.

### I.   Issues

Gundersen presents three issues: (1) whether the ALJ erred in failing to determine whether she had severe impairments of major depressive disorder and panic disorder; (2) whether he erred in assessing her residual functional capacity ("RFC") by insufficiently considering medical opinions and other medical evidence; and (3) whether he posed an incomplete hypothetical to the vocational expert ("VE"). Doc. 23 at 2.

### II.   Background

Gundersen is 62 and last worked in May 2007. Tr. 34, 36, 228. She has a high-school education and experience as an administrative assistant. Tr. 35–36. She alleges she became disabled in August 2009[3] from high blood pressure; high cholesterol; thyroid problems; neck, back, and knee pain; restless-leg syndrome; gastroesophageal reflux disease; "[n]erves"; and depression. Tr. 33, 283. She is insured through 2012. Tr. 9. She proceeded through the administrative process, failing at each level. Tr. 1–3, 9–23, 69–98. This case followed. Doc. 1.

### III.   Opinion Evidence

On June 9, 2012, Dr. Diana Cordero, a specialist in internal medicine, completed a medical source statement of Gundersen's ability to perform work-related physical activities. Tr. 516–18.[4] She opined as follows. Gundersen could lift less than

---

[3]She originally alleged she had become disabled in May 2007 but amended her alleged onset date. Tr. 33, 228, 284.

[4]Dr. Cordero also provided opinions concerning Gundersen's mental impairments on July 13, 2012, and August 21, 2012. Tr. 519–20, 524. The ALJ rejected those opinions, finding Dr. Cordero has no expertise in psychiatry, and the opinions were inconsistent with Dr. Raul

10 pounds; stand and/or walk less than two hours in an eight-hour work day; sit less than about six hours in an eight-hour work day; and occasionally climb, balance, kneel, crouch, and crawl. Tr. 516–17. Her abilities to push and pull with her arms and legs, reach, handle, finger, and feel were limited. Tr. 517–18. She needed to have limited exposure to temperature extremes. Tr. 518. The limitations began in October 2011 and arose from severe pain in her cervical spinal range and weakness in her hands. Tr. 517–18.

On June 26, 2012, psychiatrist Dr. Raul Soto-Acosta completed a medical source statement of Gundersen's ability to perform work-related mental activities. Tr. 513–14. He opined as follows. She has a good ability to get along with coworkers and peers, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Tr. 514. She has a fair ability to understand, remember, and carry out short, simple instructions; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; respond appropriately to changes in work settings; be aware of normal hazards and take appropriate precautions; and set realistic goals and make plans independently of others. Tr. 513–14. She has a poor ability to remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual; complete a normal work day or week; perform at a consistent pace; accept instructions and respond appropriately to supervisor criticism; and travel in unfamiliar places or use public transportation. Tr. 513–14. She can manage benefits in her own best interest. Tr. 514. Her persistent anxiety and depression supported those restrictions, and they began in 2008. Tr. 513–14.

---

Soto-Acosta's treatment records. Tr. 20–21. Gundersen does not challenge the ALJ's evaluation of those opinions. *See generally* Doc. 23.

## IV.   Hearing Testimony

At an October 2013 hearing, Gundersen testified as follows.

She drives two to three days a week to visit her daughter and go to the grocery store. Tr. 35. Her husband drove her to the hearing. Tr. 35. She worked for the Florida Department of Children and Families for 30 years as an administrative assistant and left in May 2007 because she "had [her] 30 years with them and … got out." Tr. 36–37. She has not worked since. Tr. 36, 39–40. After retiring but before the alleged onset date, she tried to volunteer at an elementary school reading to and making crafts with students but could not get out of bed some days and could not lift and carry things. Tr. 39–40. Her "hands started hurting so bad" she had to give up volunteering. Tr. 40.

Gundersen sees Dr. Soto-Acosta for psychological issues, and he "does [her] meds every six months." Tr. 41. She also tries to see and talk to Cynthia Hambrick—her therapist—"several times a month." Tr. 41. She takes medication daily, and pain medication helps. Tr. 41, 44. She tries to take pain medication three times daily. Tr. 57. She would "love to be able to take" medication "all the time," but it makes her "loopy," which she describes as drowsy. Tr. 41, 44, 57. Her antianxiety and antidepressant medication "do an okay job," though she has been asking her doctor to change them, and "everyday issues can … take [her] out of control no matter what [she is] on." Tr. 41–42. Emotionally, she considers a good day any day she is not crying and a bad day any day she cannot get out of bed until the afternoon. Tr. 57–58. She has been having psychological problems for more than 20 years. Tr. 62.

Gundersen had spinal fusions in her neck and back in May 2012. Tr. 42. She tried injections in her lower back, but they did not provide relief for long, so she was going to be referred to a neurosurgeon. Tr. 42. She went to physical therapy for her back pain before she stopped working. Tr. 42. She has had back pain since approximately 2001, and it has gotten worse over time. Tr. 42. She cannot remember

4

when her back pain became bad enough to prevent her from working. Tr. 43. Before she stopped working, her pain had become so severe that she needed to take pain medication daily to work. Tr. 43. Neck surgery helped for about six months, but a stabbing pain returned recently. Tr. 43. Low-back pain had become worse over the previous year. Tr. 43. She has been on pain medication for a year to a year and a half. Tr. 43.

Gundersen does not use an assistive device to walk. Tr. 44. She can walk "around [her] house as [she has] to and maybe a block" before she has to stop due to pain in her knees and lower back. Tr. 45, 47. Her doctors "always tell [her she] need[s] to exercise" but do not specify what kind of exercise. Tr. 45. She does not walk a lot and does not remember being told specifically to "do brisk walking for 30 minutes, five times a week." Tr. 46. Doctors have told her she can only walk a block, though she also has not "gone to a doctor yet that doesn't tell [her] to exercise." Tr. 47. She has not exercised regularly in "the last few years or so." Tr. 47.

Gundersen can stand "long enough to load the dishwasher" but needs to sit down afterward. Tr. 47. She can do things "in moderation." Tr. 47. She cannot sit long before becoming uncomfortable. Tr. 47. She can comfortably lift no more than "a cup of coffee." Tr. 48. She remembers meeting with Dr. Tran, but she met with him for "two minutes," and he said nothing about the weight he believed she could lift. Tr. 48. Nurses conducted the rest of the examination. Tr. 49. He tried to get her to lift 50 pounds, and she said she could not. Tr. 49. She did not lift 20 pounds during the examination. Tr. 49. She remembers doing an eye examination, but she was crying and so could not read the chart. Tr. 49. They tested her grip strength. Tr. 49. She "was so upset during the whole visit" she cannot remember all "tasks" they had asked her to perform. Tr. 49.

Gundersen used to smoke a half pack of cigarettes daily but quit in February 2013. Tr. 50. She occasionally has a glass of wine on the weekend if she does not "have to take too many pain pills." Tr. 50. She does not use recreational drugs. Tr. 50.

5

Gundersen can bathe and dress herself independently, though she has difficulty lifting both hands over her head and takes longer than usual to get dressed. Tr. 50, 59. Her husband usually cooks or they buy frozen meals. Tr. 50. She loads the dishwasher, which takes about five minutes. Tr. 50–51, 56. They have an automatic vacuum cleaner, and she and her husband do not mop "too often." Tr. 51. They "kind of tag[-]team the … housework." Tr. 51. She does the majority of the laundry, though it is hard for her to reach into the machines. Tr. 51, 60. She does not garden or do yard work. Tr. 51. She goes to the grocery store to "pick up a few things, … but [they] don't do a lot of major grocery shopping at one time." Tr. 52. She leans on the shopping cart. Tr. 52.

Gundersen used to read but stopped in May 2013 after her son's death because she has "no desire to read." Tr. 52. She and her husband have two dogs and two birds, but her husband takes care of them. Tr. 52–53. She swims in the pool in their back yard because she "can move easier in the pool." Tr. 53. She used to occasionally do crossword puzzles but has not done one in more than a year. Tr. 53. She uses a computer to do banking, check e-mail, and look at Facebook. Tr. 54. She used to play "Farmville" on Facebook but could only do it for short periods of time because she would lose feeling in her thumb. Tr. 54. She does not play board or card games. Tr. 54. She used to enjoy hobbies such as fishing but cannot do them anymore. Tr. 54. Other than riding on a boat in June 2013 to spread her son's ashes, she has not been on a boat in three or four years. Tr. 54. She often lies "on the couch and watch[es] television" and has "lots of favorite shows." Tr. 54. She "can usually follow" the stories or themes of the television shows, although she turns up the volume because she thinks she is losing her hearing. Tr. 54–55. She attended church before her son's death but has not been back since. Tr. 55.

Gundersen goes to her daughter's house and visits her four-year-old granddaughter. Tr. 55. She can babysit but cannot lift her or get down on the floor with her. Tr. 55.

6

A VE testified as follows. Gundersen has past work experience as a secretary, which is a sedentary, skilled position. Tr. 62. The ALJ asked whether a hypothetical person her age with her level of education and work experience who could perform light work and could frequently climb ramps and stairs, balance, stoop, kneel, and crouch; could occasionally crawl and climb ropes, ladders, and scaffolds; and must avoid concentrated exposure to hazards, including machinery or unprotected heights or parts could perform her past work. Tr. 62–63. The VE responded yes. Tr. 63. The ALJ asked whether the hypothetical person who also was limited to simple, routine, repetitive tasks could perform that work. Tr. 63. The VE responded no. Tr. 63.

Gundersen's representative asked the VE whether a hypothetical person limited to sedentary exertion who could frequently lift less than 10 pounds, stand less than two hours in an eight-hour work day, and sit about six hours in an eight-hour work day could sustain gainful employment. Tr. 63. The VE responded no. Tr. 63. The representative asked the VE whether a hypothetical person who has no useful ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, or complete a normal work day or week could sustain gainful employment. Tr. 64. The VE responded no. Tr. 64.

## V.    ALJ's Decision

At step one,[5] the ALJ found Gundersen had not engaged in substantial gainful activity from August 4, 2009 (her alleged onset date), through December 31, 2012 (her date last insured). Tr. 11.

---

[5]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her RFC, and (5) there are a significant number of jobs in the

At step two, the ALJ found Gundersen suffers from severe impairments of degenerative disc disease, fibromyalgia, hypothyroidism, and hyperlipidemia. Tr. 11. He acknowledged her medically determinable mental impairments of "affective mood disorder and anxiety[-]related disorders" and considered the "paragraph B" criteria[6] to determine if her mental impairments meet or equal the criteria of a listing. Tr. 12. He found she has a mild restriction in activities of daily living; mild difficulties in social functioning; mild difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. Tr. 12. Based on those findings, he found she has no severe mental impairment. Tr. 12.

At step three, the ALJ found Gundersen has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 12–13. The ALJ observed neither party contended she did. Tr. 13.

After stating he had considered the entire record, the ALJ found Gundersen has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b)[7] with additional limitations: she can frequently climb ramps and stairs; occasionally climb ropes, ladders, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl;

---

national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

[6]To evaluate a mental impairment, an ALJ must evaluate the paragraph B criteria (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) and the extent of any limitation in the first three areas (none, mild, moderate, marked, or severe). 20 C.F.R. § 404.1520a(a) & (c). An ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique." 20 C.F.R. § 404.1520a(e)(4). "The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4).

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

and must avoid concentrated exposure to hazards, including machinery and unprotected heights. Tr. 13.

In assessing the RFC, the ALJ discussed hearing testimony and medical records, including treatment notes from Drs. Cordero, Soto-Acosta, Shahid Zeb, Kenneth Powell, and Eric Gabriel. Tr. 13–22. He assigned little weight to Dr. Cordero's opinions in the July 13, 2012, medical source statement because (1) he found them inconsistent with treatment records showing medical providers had consistently advised her to exercise for 30 minutes a day 5 days a week; (2) she had told her pain specialist she received relief from her medication and injections; and (3) she had told Dr. Gabriel she had "received significant pain relief following cervical spine surgery." Tr. 21. He assigned little weight to Dr. Soto-Acosta's opinions in his June 26, 2012, medical source statement for the asserted reason they contradicted his own treatment records, observing Dr. Soto-Acosta had seen her twice a year and prescribed medication; had never recommended inpatient treatment; and had never initiated a Baker Act petition. Tr. 17–18, 22.

At step four, based on the VE's testimony, the ALJ found Gundersen could perform her past relevant work as a secretary. Tr. 22. He therefore found no disability. Tr. 22.

VI. **Standard of Review**

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.*

## VII. Analysis

### A. *Whether the ALJ Erred in Failing to Find Severe Mental Impairments*

Gundersen argues the ALJ erred in failing to find she suffered from severe mental impairments because the medical evidence establishes her depression and panic disorder "significantly limit[ed] her mental ability to perform basic work activities." Doc. 23 at 11–13. The Commissioner disagrees. Doc. 24 at 4–13.

At step two, an ALJ considers whether the claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is an impairment that significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (defining "non-severe impairment"). "Step two is a threshold inquiry." *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986). It "acts as a filter" to eliminate claims involving no substantial impairment. *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987). The finding that any impairment is severe suffices to satisfy step two. *Id.*

The ALJ found Gundersen did not have a severe mental impairment because he found she had a mild restriction in activities of daily living; mild difficulties in social functioning; mild difficulties maintaining concentration, persistence, and pace; and no episode of decompensation of extended duration. Tr. 12. Substantial evidence supports those findings.

On activities of daily living, the ALJ observed Gundersen had been appropriately dressed and groomed at most medical and counseling appointments. Tr. 12. On social functioning, he observed she had interacted appropriately and effectively with medical personnel and maintained relationships with family. Tr. 12. On concentration, persistence, or pace, he observed she could use a computer, drive, and manage money. Tr. 12. And he observed there was "no credible evidence" of an episode of decompensation of extended duration. Tr. 12.

Gundersen does not challenge those findings directly but instead points to other evidence she contends supports a finding her mental impairments are severe. Doc. 23 at 12–13. She points to "references to [her] mental conditions throughout the record"; Dr. Soto-Acosta's June 26, 2012, medical source statement stating she had poor abilities in several areas of mental functioning; and consultative examining psychiatrist Dr. Peter Knox's report, which states she has generalized anxiety disorder and dysthymic disorder, experienced "some limitation" in concentration and persistence, and had a Global Assessment of Functioning ("GAF") scale rating of 50. Doc. 23 at 12–13.

The evidence Gundersen cites does not change that substantial evidence supports the ALJ's decision. The mere existence of diagnoses of mental impairments does not establish their severity. The ALJ gave significant weight to most of Dr. Knox's opinions but no weight to the GAF score as inconsistent with other evidence of Gundersen's functioning. Tr. 19–20. Gundersen does not challenge the ALJ's evaluation of Dr. Knox's opinion. *See generally* Doc. 23. And, as discussed below, substantial evidence supports the ALJ's decision to give little weight to Dr. Soto-Acosta's opinions.

Regardless, any failure to identify all impairments that should be considered severe is harmless. Although an ALJ does not have to identify at step two all impairments that should be considered severe, he must demonstrate he considered at step three all of the claimant's impairments—severe and non-severe—in combination. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010). "[A] simple expression of [his] consideration of the combination of impairments constitutes a sufficient statement of such findings." *Id.* (citing *Jones v. HHS*, 941 F.2d 1529, 1533 (11th Cir. 1991)).

Here, because the ALJ found Gundersen suffers from other severe impairments at step two and continued with the analysis, any failure to find severe mental impairments is harmless. His decision shows he considered her mental

11

impairments at later steps. At step three, he found she does not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 12–13. In the RFC analysis, he discussed medical evidence of her mental impairments and assigned weight to medical opinions on how those impairments affected her ability to work. Tr. 14, 16–22.

B.  *Whether the ALJ Failed to Properly Assess Gundersen's RFC*

Gundersen argues the ALJ improperly assessed her RFC because he (1) failed to state the weight he was giving some medical opinions; (2) failed to provide good cause for discounting the opinions of Drs. Cordero and Soto-Acosta; and (3) failed to state all findings associated with a February 2012 cervical spine MRI. Doc. 23 at 13–23.

A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The SSA uses the RFC at step four to decide if she can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. § 404.1545(a)(5).

1.  *Whether the ALJ Erred in Failing to Assign Weight to Medical Opinions*

Gundersen argues the ALJ erred in failing to assign weight to opinions from Drs. Zeb, Powell, Gabriel, and Terel Newton, all of whom assertedly were treating physicians. Doc. 23 at 14–20. The Commissioner responds she failed to identify specific opinions from them and failed to show their findings and diagnoses "established that she was more limited than as found by the ALJ." Doc. 24 at 14–16.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R.

§ 404.1527(a). Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of a claim is rational and supported by substantial evidence." *Id.* "Unless [an ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (internal quotations omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, reversal and remand based on the ALJ's failure to state the weight he was giving the identified opinions is unwarranted. Although the physicians' findings qualify as "medical opinions" because they reflect judgments about Gundersen's symptoms and diagnoses, the findings suggest no limitations beyond those the ALJ identified. The records Gundersen cites include complaints of pain and/or numbness, the physicians' examination findings of tenderness and degenerative changes, and several diagnoses. *See* Tr. 466–71, 481–91, 499–500, 540, 544–46, 580–88, 590, 592–93, 596–97, 610–11, 623–24. But diagnoses alone do not establish functional limitations, *See Moore*, 405 F.3d at 1213 n.6, and Gundersen has failed to show how the diagnoses and findings she cites would change the RFC the ALJ assessed.

The ALJ discussed treatment notes from Drs. Zeb, Powell, and Gabriel in his RFC evaluation. Tr. 15–16. Those notes are not obviously inconsistent with the RFC. Although the ALJ did not discuss Dr. Newton's treatment notes, only one concerned an examination before Gundersen's date last insured, and it simply contained her

13

subjective complaints of pain; findings of tenderness and positive facet loading in her spine and antalgic gait; diagnoses of lumbago, sacroiliitis, depressive disorder, and generalized anxiety disorder; and a recommendation to take pain medication. Tr. 623. Nothing in that treatment note suggests greater limitations than the ALJ found.

The ALJ's decision does not leave the Court "pondering why [he] made the decision he made." *See Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016) (quoted) (concluding ALJ's failure to state weight he gave to one doctor's findings and to mention the findings of two others was harmless because the opinions "were consistent with the ALJ's conclusion," and "the order demonstrates thoughtful consideration of the findings and supports the overall conclusion that [the claimant] is not disabled"). His failure to assign weight to the identified findings does not warrant reversal and remand.

2. *Whether the ALJ Failed to Provide Good Cause for Discounting Treating Physicians' Opinions*

Gundersen argues the ALJ did not provide good cause for not assigning controlling weight to the opinions of Dr. Cordero in her medical source statement on Gundersen's physical work-related abilities and the opinions of Dr. Soto-Acosta in his medical source statement on her mental work-related abilities. Doc. 23 at 20–22. The Commissioner disagrees. Doc. 24 at 12–13, 16–18.

The SSA generally will give more weight to the medical opinions of treating sources[8] because they "are likely to be the medical professionals most able to provide

---

[8]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1502. An ALJ "may consider an acceptable medical source who has treated or evaluated [a claimant] only a few times" a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." *Id.*

a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence did not bolster the opinion, the evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

Unless the SSA gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c).

The ALJ provided good cause for giving little weight to Drs. Cordero's and Soto-Acosta's opinions. He gave little weight to Dr. Cordero's physical medical source statement because (1) Gundersen's doctors consistently told her to exercise; (2) she indicated her pain medication alleviated her pain; and (3) she said she had experienced significant relief after neck surgery in May 2012. Tr. 21. Substantial evidence supports those reasons. First, records indicate Drs. Charles Booras and Emad Naem recommended exercise on several occasions. Tr. 401, 404, 412, 415, 420, 601, 606. Gundersen testified doctors "always tell [her she] needs to exercise," Tr. 45, and she had not "gone to a doctor yet that doesn't tell [her] to exercise," Tr. 47. Second, Gundersen reported at several appointments and at the evidentiary hearing that medication helps alleviate her pain. Tr. 41, 44, 467, 470, 482, 487, 489–90, 535, 540, 610, 623, 633. That she also continued to report pain does not undermine that reason for rejecting Dr. Cordero's opinion because the ALJ found her complaints of pain were at least somewhat credible and adjusted the RFC accordingly. Tr. 13–14. Third, records from follow-up appointments after neck surgery indicate her pre-operative

symptoms had resolved. Tr. 580, 582. That she continued to report discomfort is not inconsistent with the ALJ's finding she experienced "significant relief." And although the surgery did not address pain in other areas of her back, evidence it almost resolved her neck pain supports the ALJ's decision to the extent Dr. Cordero's opinions included limitations arising specifically from neck pain. Taken together, the ALJ's reasons, supported by substantial evidence, provided good cause to give little weight to Dr. Cordero's opinions.

The ALJ gave little weight to Dr. Soto-Acosta's mental medical source statement because he found it inconsistent with Dr. Soto-Acosta's own treatment records. Tr. 17. He elaborated that Dr. Soto-Acosta saw Gundersen twice a year to manage her medications; he frequently assigned a GAF scale rating in the 70s; and he never recommended inpatient treatment or initiated a Baker Act petition. Tr. 17–18, 22. Substantial evidence supports the ALJ's reasoning. Records show Dr. Soto-Acosta saw Gundersen every five to six months from her alleged onset date through her date last insured; he routinely managed her medication but did not recommend more significant treatment; and he assessed GAF scale ratings in the 70s in 2009 and 2010, declining to 60 in December 2011, and reaching as low as 55 in November 2012.[9]

---

[9] The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32−34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF scale rating of 21–30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. Manual at 34. A GAF scale rating of 31–40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF scale rating of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

Tr. 351–55, 554–57. She often reported feeling "OK" and reported worse symptoms based on stressors, such as her son's hospitalization for suicidal threats. Tr. 352–53, 555. Dr. Soto-Acosta's treatment notes contain minimal information and are fairly unremarkable, and, although they provided evidence that Gundersen's mental impairments slowly worsened over time, they are inconsistent with his opinion that, beginning in 2008, she had only a poor to fair ability to perform all but three of the work-related mental activities on the medical-source-statement form. *See* Tr. 513–14.

3.   *Whether the ALJ Failed to Accurately Discuss the February 2012 MRI*

Gundersen argues the ALJ did not accurately describe the results of the February 2012 cervical spine MRI because he omitted significant findings. Doc. 23 at 22–23. The Commissioner does not respond to this argument. *See generally* Doc. 24.

An ALJ must consider all relevant record evidence in making a disability determination. 20 C.F.R. § 404.1520(a)(3). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to

---

The latest edition of the Manual has abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). In July 2013, the SSA issued Administrative Message (AM)-13066, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF scores. Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM–13066 (July 22, 2013) REV (Oct. 14, 2014). AM-13066 acknowledged DSM-5 eliminated the use of GAF, but confirmed that adjudicators will continue to consider GAF scores as opinion evidence. As with other opinion evidence, however, a GAF needs supporting evidence to be given much weight. *Id.* According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Id.* The SSA cautions that a "GAF score is never dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with the other evidence." *Id.*

conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (quotations omitted).

The ALJ did not err by failing to recite every finding associated with the February 2012 MRI. That the ALJ referred to that record in his decision demonstrates he considered it, *see* Tr. 15 (citing Tr. 475); his omission of some findings does not suggest he failed to consider the record as a whole. Moreover, other than asserting that the unmentioned findings were "much more significant," *see* Doc. 23 at 22, Gundersen does not explain how those findings would support additional limitations.

C.   ***Whether the ALJ Posed an Incomplete Hypothetical to the VE***

Citing her previous argument that the ALJ improperly assessed her RFC, Gundersen argues the ALJ also erred in failing to pose a hypothetical question to the VE that included all of her limitations. Doc. 23 at 23–24. The Commissioner responds Gundersen failed to show she had additional functional limitations, so the hypothetical was not incomplete. Doc. 24 at 18–20.

At step five, an ALJ must decide whether a significant number of one or more jobs that the claimant can perform exist in the national economy. 20 C.F.R. § 404.1566(b). An ALJ may use a VE's testimony for that determination. *Winschel v. Comm'r*, 631 F.3d 1176, 1180 (11th Cir. 2011). For a VE's testimony to be substantial evidence, the ALJ must pose a hypothetical question that includes all of the claimant's impairments. *Id.*

Because the ALJ did not err in assessing Gundersen's RFC, and because the hypothetical question the ALJ posed was materially the same as that RFC assessment,[10] the ALJ did not pose an incomplete hypothetical. The VE's testimony

---

[10]The hypothetical question included limitations to frequent balancing, stooping, kneeling, and crouching. Tr. 62–63. The RFC included limitations to occasional balancing,

18

therefore provided substantial evidence for the ALJ's finding Gundersen could perform her past work as a secretary.

## VIII. Conclusion

The Court **affirms** the Commissioner's decision denying Gundersen's claim for benefits and **directs** the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on March 20, 2017.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of Record

---

stooping, kneeling, and crouching. Tr. 13. The ALJ therefore failed to include in the hypothetical the more restrictive limitations he later found in assessing Gundersen's RFC. Nevertheless, that failure was harmless. The VE testified Gundersen's past work was classified in the Dictionary of Occupational Titles ("DOT") as "secretary," with a DOT code of 201.362-030. Tr. 62. According to that DOT classification, the secretary occupation does not require any balancing, stooping, kneeling, or crouching. *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, No. 201.362-030, 1991 WL 671672. Whether Gundersen could frequently or only occasionally perform those postural activities makes no difference.